# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JATIN CHOPRA, Individually and On Behalf of All Others Similarly Situated, | Case No.: 21-CV-5973 |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| v. | **JURY TRIAL DEMANDED** |
| DIDI GLOBAL INC. F/K/A XIAOJU KUAIZHI INC., WILL WEI CHENG, ALAN YUE ZHUO, JEAN QING LIU, STEPHEN JINGSHI ZHU, ZHIYI CHEN, MARTIN CHI PING LAU, KENTARO MATSUI, ADRIA PERICA, DANIEL YONG ZHANG, GOLDMAN SACHS (ASIA) L.L.C., MORGAN STANLEY & CO. LLC, J.P. MORGAN SECURITIES LLC, BOFA SECURITIES, INC., BARCLAYS CAPITAL INC., CHINA RENAISSANCE SECURITIES (HONG KONG) LIMITED, CHINA INTERNATIONAL CAPITAL CORPORATION HONG KONG SECURITIES LIMITED, CITIGROUP GLOBAL MARKETS INC., GUOTAI JUNAN SECURITIES (HONG KONG) LIMITED, HSBC SECURITIES (USA) INC., UBS SECURITIES LLC, BOCI ASIA LIMITED, BOCOM INTERNATIONAL SECURITIES LIMITED, CCB INTERNATIONAL CAPITAL LIMITED, CLSA LIMITED, CMB INTERNATIONAL CAPITAL LIMITED, FUTU INC., ICBC INTERNATIONAL SECURITIES LIMITED, MIZUHO SECURITIES USA LLC, and TIGER BROKERS (NZ) LIMITED, | |
| Defendants. | |

Jatin Chopra ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following based upon the investigation of plaintiff's counsel, except as to allegations specifically pertaining to plaintiff, which are based upon personal

knowledge.  The investigation of counsel, included, among other things, a review of the public filings made by DiDi Global Inc. f/k/a Xiaoju Kuaizhi Inc. ("DiDi" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"), press releases and media reports issued by the Company, news reports about the Company, and other publicly available information concerning DiDi, including, but not limited to, publicly available trading data relating to the price and trading volume of DiDi securities and analyst reports.

## I.   NATURE OF THE ACTION AND OVERVIEW

1.   This is a securities class action brought by Plaintiff under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of persons and entities that purchased or otherwise acquired DiDi: (a) American Depositary Shares ("ADSs" or "shares") pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's June 2021 initial public offering ("IPO" or the "Offering"); and/or (b) purchased DiDi securities between June 30, 2021 and July 2, 2021, inclusive (the "Class Period").

2.   DiDi purports to be the world's largest mobility technology platform. Its four key components are: shared mobility, auto solutions, electronic mobility, and autonomous driving. The Company claims to be the "go-to brand in China for shared mobility," offering a range of services including ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services.

3.   On June 10, 2021, DiDi (then named Xiaoju Kuaizhi Inc.) filed a Registration Statement on Form F-1 with the SEC to register its Class A ordinary shares, which, collectively with subsequently filed amendments on Forms F-1/A and F-1MEF, a Registration on Form F-6 and a June 30, 2021 prospectus on Form 424B4 (the "Prospectus"), forms part of the Registration Statement for the Company's IPO.

4.      In the IPO and pursuant to the Registration Statement, including the Prospectus, the Company sold approximately 316,800,000 shares at a price of $14.00 per share, not including the underwriters' option to sell an additional 47,520,000 ADSs.

5.      On July 2, 2021, multiple news outlets reported that the Cyberspace Administration of China ("CAC") had posted an announcement that the CAC had launched an investigation into DiDi to protect national security and the public interest.

6.      Also on July 2, 2021, DiDi issued a press release entitled "DiDi announces CyberSecurity Review in China," confirming that the Company was under investigation and stating that "pursuant to the announcement posted by the PRC's Cyberspace Administration Office on July 2, 2021, DiDi is subject to cybersecurity review by the authority."  The Company's press release also states "[d]uring the review, DiDi is required to suspend new user registration in China."

7.      On this news, the Company's share price fell $0.87 per share, or approximately 5.3%, to close at $15.53 per share on July 2, 2021, on unusually heavy trading volume.

8.      On Sunday, July 4, 2021, DiDi issued a press release entitled "DiDi Announces App Takedown in China[,]" which announced, in relevant, part that the CAC ordered smartphone app stores to stop offering the "DiDi Chuxing" app because the DiDi app "collect[ed] personal information in violation of relevant PRC laws and regulations." Though users who previously downloaded the DiDi app could continue to use it, DiDi stated that "the app takedown may have an adverse impact on its revenue in China."

9.      On July 5, 2021, *The Wall Street Journal* reported that "[w]eeks before Didi Global, Inc. went public in the U.S., China's cybersecurity watchdog suggested the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination of its network security, according to people with knowledge of the matter."   Subsequently, Bloomberg

and other sources reported on July 6, 2021 that the CAC had asked DiDi at least three months earlier to delay its because of national security concerns.

10.     On this news, the Company's share price fell $3.04 per share, or 19.6%, to close at $12.49 per share on July 6, 2021, on unusually heavy trading volume.

11.     On July 9, 2021, DiDi shares closed at $12.03 per share, a decline of over 16% from the $14 per share IPO price.

12.     The Registration Statement was materially false and misleading and omitted to state material adverse facts. Throughout the Class Period, including in the Registration Statement, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the CAC had already asked DiDi weeks or months prior to the IPO to delay its IPO to conduct a self-examination of its network security and because of national security concerns; (2) that the Company was likely to incur heightened regulatory scrutiny and adverse regulatory action by ignoring the CAC's request to postpone the IPO; (3) that, as a result of the foregoing, DiDi's apps were reasonably likely to be taken down from app stores in China, which would have an adverse effect on its financial results and operations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

14.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act ((15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

15.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act ((15 U.S.C. §§ 78aa(c)).

16.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as DiDi's ADSs trade on the NYSE in this district and many of the underwriters of DiDi's IPO have offices in this District.  The Prospectus also makes reference to the "United States District Court for the Southern District of New York" as the appropriate venue, or alternatively the state courts of New York if this District lacks jurisdiction.

17.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

18.    Plaintiff Jatin Chopra, as set forth in the accompanying certification, incorporated by reference herein, purchased DiDi securities pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.    Defendant DiDi is incorporated under the laws of the Cayman Islands with its

principal executive offices located in Beijing, China. DiDi's shares trade on the New York Stock Exchange under the symbol "DIDI."

20.     Defendant Will Wei Cheng ("Cheng") was, at all relevant times, the Chairman of the Board of Directors and the Chief Executive Officer ("CEO") of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant Alan Yue Zhuo ("Zhuo") was, at all relevant times, the Chief Financial Officer ("CFO") of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendants Cheng and Zhuo (collectively the "Exchange Act Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market.  The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Exchange Act Individual Defendants are liable for the false statements pleaded herein.

23.     Defendant Jean Qing Liu ("Liu") was a Director and the President of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.     Defendant Stephen Jingshi Zhu ("Zhu") was a Director, Senior Vice President and Chief Executive Officer of International Business Group and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

25.     Defendant Zhiyi Chen ("Chen") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

26.     Defendant Martin Chi Ping Lau ("Lau") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

27.     Defendant Kentaro Matsui ("Matsui") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

28.     Defendant Adrian Perica ("Perica") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

29.     Defendant Daniel Yong Zhang ("Zhang") was a director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

30.     Defendants Cheng, Zhuo, Liu, Zhu, Chen, Lau, Matsui, Perica, and Zhang are collectively referred to hereinafter as the "Individual Defendants."

31.     Defendant Goldman Sachs (Asia) L.L.C. ("Goldman Sachs") served as an underwriter for the Company's IPO.

32.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") served as an underwriter for the Company's IPO.

33.     Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter for the Company's IPO.

34.     Defendant BofA Securities, Inc. ("BofA") served as an underwriter for the Company's IPO.

35.     Defendant Barclays Capital Inc. ("Barclays") served as an underwriter for the Company's IPO.

36.     Defendant China Renaissance Securities (Hong Kong) Limited ("China Renaissance") served as an underwriter for the Company's IPO.

37.     Defendant China International Capital Corporation Hong Kong Securities Limited ("China International") served as an underwriter for the Company's IPO.

38.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter for the Company's IPO.

39.     Defendant Guotai Junan Securities (Hong Kong) Limited ("Guotai") served as an underwriter for the Company's IPO.

40.     Defendant HSBC Securities (USA) Inc. ("HSBC") served as an underwriter for the Company's IPO.

41.     Defendant UBS Securities LLC ("UBS") served as an underwriter for the Company's IPO.

42.     Defendant BOCI Asia Limited ("BOCI") served as an underwriter for the Company's IPO.

43.     Defendant BOCOM International Securities Limited ("BOCOM") served as an underwriter for the Company's IPO.

44.     Defendant CCB International Capital Limited ("CCB") served as an underwriter for the Company's IPO.

45.     Defendant CLSA Limited ("CLSA") served as an underwriter for the Company's IPO.

46.     Defendant CMB International Capital Limited ("CMB") served as an underwriter for the Company's IPO.

47.     Defendant Futu Inc. ("Futu") served as an underwriter for the Company's IPO.

48.     Defendant ICBC International Securities Limited ("ICBC") served as an underwriter for the Company's IPO.

49.     Defendant Mizuho Securities USA LLC ("Mizuho") served as an underwriter for the Company's IPO.

50.     Defendant Tiger Brokers (NZ) Limited ("Tiger Brokers") served as an underwriter for the Company's IPO.

51.     Defendants Goldman Sachs, Morgan Stanley, J.P. Morgan, BofA, Barclays, China Renaissance, China International, Citigroup, Guotai, HSBC, UBS, BOCI, BOCOM, CCB, CLSA, CMB, Futu, ICBC, Mizuho, and Tiger Brokers are collectively referred to hereinafter as the "Underwriter Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background

52.     DiDi purports to be the world's largest mobility technology platform. Its four key components are: shared mobility, auto solutions, electronic mobility, and autonomous driving. The Company claims to be the "go-to brand in China for shared mobility," offering a range of services including ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services.

### B.     The Company's Materially False and Misleading Registration Statement and Prospectus in violation of the Securities Act

53.     On June 10, 2021, the Company filed a Registration Statement on Form F-1 with the SEC to register its Class A ordinary shares, which forms part of the Registration Statement.

54.     On June 24, 2021, the Company filed a Registration Statement on Form F-6 with the SEC to register its ADSs, which forms part of the Registration Statement.

55.     On June 24, 2021, the Company filed Amendment No. 1 to the Registration Statement with the SEC on Form F-1A, which forms part of the Registration Statement.

56.     On June 28, 2021, the Company filed Amendment No. 2 to the Registration Statement with the SEC on Form F-1A, which forms part of the Registration Statement.

57.     On June 29, 2021, the Company filed a Form F-1MEF, which forms part of the Registration Statement. The Registration Statement was declared effective the same day.

58.     On June 30, 2021, the Company filed its prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement. As stated above in ¶ 4, in the IPO, the Company sold approximately 316,800,000 shares at a price of $14.00 per share, not including the underwriters' option.  Four ADSs represent one Class A ordinary share. The Company estimated it would receive net proceeds of approximately $4.3 billion from the Offering (or $4.98 billion if the underwriters exercised their option to purchase additional ADSs in full) after deducting the underwriting discounts, commissions and estimated offering expenses.  The proceeds from the IPO were purportedly to be used to invest in the Company's technology capabilities, grow its presence in certain international markets outside of China, introduce new products and expand existing offerings, and general corporate purposes.

59.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

60.     Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

61.     However, the Registration Statement for the IPO was issued with materially false facts and while omitting to state other facts necessary to make the statements made not misleading. Specifically, the Registration Statement was materially false and misleading and omitted to inform

investors: (1) that the CAC had asked DiDi months or weeks prior to the IPO to delay its IPO to conduct a self-examination of its network security and because of national security concerns; (2) that the Company was likely to incur heightened regulatory scrutiny and adverse regulatory action by ignoring the CAC's request to postpone the IPO; (3) that, as a result of the foregoing, DiDi's apps were reasonably likely to be taken down from app stores in China, which would have an adverse effect on its financial results and operations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

62.     For example, the Registration Statement acknowledged that DiDi is "subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions . . . including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021" and purported to warn of the risks of failure to comply with regulation enacted by the PRC government in the areas of Internet Security and Privacy Protection, although these risks had already materialized and the CAC had already asked DiDi to postpone the IPO.  Specifically, the Registration Statement represented as follows:

**Regulation Relating to Internet Security**

The PRC government has enacted various laws and regulations with respect to internet security and protection of personal information from any inappropriate collection activities, abuse or unauthorized disclosure. Internet information in the PRC is regulated and restricted from a national security standpoint. . . .

According to the Cybersecurity Law and other related laws and regulations, internet service providers are required to take measures to ensure internet security by complying with security protection obligations, formulating cybersecurity emergency response plans, and providing technical assistance and support for public security and national security authorities. In addition, any collection, process and use of a user's personal information must be subject to the consent of the user,

be legal, rational and necessary, and be limited to specified purposes, methods and scopes. An internet service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or providing such information to other parties illegally.

***Failure to comply with the above laws and regulations may subject the internet service providers to administrative penalties including, without limitation, fines, suspension of business operation, shut-down of the websites, revocation of licenses and even criminal liabilities.*** [Emphasis added.]

On June 10, 2021, the Standing Committee of the National People's Congress of China promulgated the Data Security Law, which will take effect in September 2021. The Data Security Law provides for data security and privacy obligations on entities and individuals carrying out data activities. . . . As the Data Security Law was recently promulgated and has not yet taken effect, ***we may be required to make further adjustments to our business practices to comply with this law.*** [Emphasis added.]

### Regulations Relating to Privacy Protection

In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. The Cyber Security Law imposes certain data protection obligations on network operators, including that network operators may not disclose, tamper with, or damage users' personal information that they have collected, or provide users' personal information to others without consent. Exempted from these rules is information irreversibly processed to preclude identification of specific individuals. Moreover, network operators are obligated to delete unlawfully collected information and to amend incorrect information.

The Several Provisions on Regulating the Market Order of Internet Information Services, issued by the MIIT on December 29, 2011 and effective on March 15, 2012, stipulate that internet information service providers may not collect any user personal information or provide any such information to third parties without the consent of a user, unless otherwise stipulated by laws and administrative regulations. "User Personal information" is defined as information relevant to the users that can lead to the recognition of the identity of the users independently or in combination with other information. An internet information service provider must expressly inform the users of the method, content and purpose of the collection and processing of such user personal information and may only collect such information as necessary for the provision of its services. An internet information service provider is also required to properly store user personal information, and in case of any leak or likely leak of the user personal information, the internet information service provider must take immediate remedial measures and, in severe circumstances, make an immediate report to the telecommunications regulatory authority.

The Decision on Strengthening the Protection of Online Information, issued by the Standing Committee of the National People's Congress on December 28, 2012, and the Order for the Protection of Telecommunication and Internet User Personal Information, issued by the MIIT on July 16, 2013, stipulate that any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scope. An internet information service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or proving such information to other parties. An internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. ***Any violation of the above decision or order may subject the internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities.*** [Emphasis added.]

63.    As to data privacy, the Registration Statement also disclosed the following risks that ***could*** affect the Company. Specifically, it stated, in relevant part:

Despite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, ***it is possible that our practices, offerings or platform could fail to meet all of the requirements imposed on us by such laws, regulations or obligations. Any failure on our part to comply with applicable laws or regulations*** or any other obligations relating to privacy, data protection or information security, or any compromise of security that results in unauthorized access, use or release of personally identifiable information or other data, or the perception or allegation that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing drivers and riders from using our platform or ***result in investigations, fines, suspension of one or more of our apps, or other penalties by government authorities and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations.*** Even if our practices are not subject to legal challenge, the perception of privacy concerns, whether or not valid, may harm our reputation and brand and adversely affect our business, financial condition and results of operations.

64.    Regarding regulatory oversight, the Registration Statement stated that in April 2021, it had participated in a meeting with Chinese regulators regarding compliance with antimonopoly, anti-unfair competition, tax, and other related laws.  Following the meeting, the Company conducted a self-inspection as to certain issues, but the Registration Statement stated that DiDi "cannot assure you that the regulatory authorities will be satisfied with our self-

inspection results or that we will not be subject to any penalty with respect to . . . privacy protection.

. . . ".  Specifically, it stated:

> For example, in April 2021, the State Administration for Market Regulation, together with the Cyberspace Administration and the State Administration of Taxation, held a meeting with more than 30 major internet companies in China, including us. All companies that participated in the meeting were required to conduct a self-inspection within one month to identify and correct possible violations of anti-monopoly, anti-unfair competition, tax and other related laws and regulations and submit their compliance commitments for public supervision. As of the date of this prospectus, we have completed the self-inspection and the relevant governmental authorities have conducted onsite inspections of our company. ***Our self-inspection uncovered a number of areas which could be deemed problematic from the compliance perspective, including potential anticompetitive practices in certain ancillary services such as electric vehicle charging, disclosure of driver income and related policies, inaccurate marketing and promotional materials, potentially unfair pricing in the community group buying business*** which has ceased to be our consolidated subsidiary since March 31, 2021, and failure to make filings of certain transactions subject to merger control review. We have made efforts to correct or improve the above areas to ensure compliance to the extent we can. However, ***we cannot assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to any violations*** of anti-monopoly, anti-unfair competition, pricing, advertisement, ***privacy protection***, food safety, product quality, tax and other related laws and regulations. We expect that these areas will receive greater and continued attention and scrutiny from regulators and the general public going forward. As a result, we may be subject to additional inspections and/or investigations and may incur additional costs and expenses, devote more of our management's attention and allocate additional resources to comply with the relevant laws and regulations and other requirements of relevant government authorities.  [Emphasis added.]

65.     The Registration Statement emphasized that DiDi relied on the market in China for its operations. It stated that "China is the best starting place for realizing [DiDi's] vision for mobility" and that "China's mobility market is expected to reach US$3.9 trillion by 2040, by which time the penetration of shared mobility and electric vehicles is expected to have increased to 35.9% and 50.2%, respectively . . . ."

66.     DiDi also stated that "[i]n 2020, the number of ride hailing transactions from our top five cities in China constituted approximately 20% of our total China ride hailing transactions." Therefore, "any changes to local laws or regulations within these cities that affect [the Company's]

14

ability to operate or increase [its] operating expenses in these markets would have an adverse effect on our business."

67.     The Company purportedly "follow[ed] strict procedures in collecting, transmitting, storing and using user data pursuant to [its] data security and privacy policies." In fact, the Registration Statement represented that DiDi "collect[s] personal information and other data from [its] users and use such data in the course of [its] operations only with their prior consent."

**C.     Materially False and Misleading Statements Issued During the Class Period in violation of the Exchange Act**

68.     The Class Period begins on June 30, 2021. On that day, the Company filed its Prospectus, which contained the statements alleged in ¶¶ 62-67.

69.     The above statements identified in ¶ 68 were materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects to the extent that the statements emphasized the importance of the Chinese market and purported to warn investors that the regulatory authorities "could" find the Company to be out of compliance with laws and regulations or might not be satisfied with the Company's self-inspection results, which in turn could result in the suspension of operations or other penalties that could materially adversely affect DiDi's business. Specifically, Defendants failed to disclose to investors: (1) that the CAC had already asked DiDi weeks or months prior to the IPO to delay its IPO to conduct a self-examination of its network security and because of national security concerns; (2) that the Company was likely to incur heightened regulatory scrutiny and adverse regulatory action by ignoring the CAC's request to postpone the IPO; (3) that, as a result of the foregoing, DiDi's apps were reasonably likely to be taken down from app stores in China, which would have an adverse effect on its financial results and operations; and (4) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects, were materially misleading and/or lacked a reasonable basis.

D.     **The Truth Emerges**

70.     The truth began to emerge on July 2, 2021 when the CAC stated that it had launched an investigation into DiDi to protect national security and the public interest.

71.     On this news, the Company's share price fell $0.87, or approximately 5.3%, to close at $15.53 per share on July 2, 2021, on unusually heavy trading volume.

72.     Also on July 2, 2021, DiDi issued a press release that stated:

DiDi Global Inc. ("DiDi" or the "Company") (NYSE: DIDI), the world's leading mobility technology platform, today announced that pursuant to the announcement posted by the PRC's Cyberspace Administration Office on July 2, 2021, DiDi is subject to cybersecurity review by the authority. During the review, DiDi is required to suspend new user registration in China.

DiDi will fully cooperate with the PRC government authority during the review.  It plans to conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities.

Apart from the suspension of new user registration in China, DiDi maintains normal operation.

73.     On Sunday, July 4, 2021, DiDi issued a press release announcing that the CAC ordered smartphone app stores to stop offering the "DiDi Chuxing" app because it "collect[ed] personal information in violation of relevant PRC laws and regulations." The Company was ordered to make changes to comply with Chinese data protection rules to "ensure the safety of the personal information of users." DiDi stated that it "will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security, and continue to provide secure and convenient services to its users." Though users who previously downloaded the app could continue to use it, DiDi stated that "the app takedown may have an adverse impact on its revenue in China."

74.     On Sunday July 5, 2021, *The Wall Street Journal* reported that the CAC had asked the Company weeks prior to the IPO to postpone the offering because of national security concerns and to "conduct a thorough self-examination of its network security."  Subsequently, Bloomberg

16

and other sources reported on July 6, 2021that the CAC had asked DiDi at least three months earlier to delay its because of national security concerns.

75.    On this news, the Company's stock price fell $3.04 per share, approximately 19.6%, to close at $12.49 per share on July 6, 2021, on unusually heavy trading volume.

76.    On July 9, 2021, DiDi shares closed at $12.03 per share, a decline of over 16% from the $14 per share IPO price.

## V.    CLASS ACTION ALLEGATIONS

78.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired DiDi: (a) ADSs issued in connection with the Company's IPO; and/or (b) securities between June 30, 2021 and July 2, 2021, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

79.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DiDi's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of DiDi shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by DiDi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

80.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

81.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

82.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

> a.  whether the federal securities laws were violated by Defendants' acts as alleged herein;
>
> b.  whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DiDi; and
>
> c.  to what extent the members of the Class have sustained damages and the proper measure of damages.

83.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.   <u>LOSS CAUSATION</u>

84.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

85.     During the Class Period, Plaintiff and the Class purchased DiDi's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## VII.   SCIENTER ALLEGATIONS

86.     As alleged herein, with respect to claims under the Exchange Act DiDi and the Exchange Act Individual Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, DiDi and the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DiDi, their control over, and/or receipt and/or modification of DiDi's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DiDi, participated in the fraudulent scheme alleged herein.

87.     DiDi and the Exchange Act Individual Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including the Exchange Act Individual Defendants.  Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because the Exchange Act Individual Defendants were the most senior offices of DiDi, issued statements

and press releases on behalf of DiDi and had the opportunity to commit the fraud alleged herein. Further, the Exchange Act Individual Defendants were motivated to commit the fraud alleged in order to complete the IPO with shares at an inflated price and to maintain shares at inflated prices during the Class Period.

## VIII.   APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

88.     The market for DiDi's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, DiDi's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of DiDi's securities and market information relating to DiDi, and have been damaged thereby.

89.     During the Class Period, the artificial inflation of DiDi's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DiDi's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of DiDi and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

90.     At all relevant times, the market for DiDi's securities was an efficient market for the following reasons, among others:

    a.   DiDi shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

    b.   As a regulated issuer, DiDi filed periodic public reports with the SEC and/or the NYSE;

    c.   DiDi was covered regularly by securities analysts; and

    d.   DiDi regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

91.    As a result of the foregoing, the market for DiDi's securities promptly digested current information regarding DiDi from all publicly available sources and reflected such information in DiDi's share price. Under these circumstances, all purchasers of DiDi's securities during the Class Period suffered similar injury through their purchase of DiDi's securities at artificially inflated prices and a presumption of reliance applies.

92.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## IX.   <u>NO SAFE HARBOR</u>

93.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could

cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DiDi who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 11 of the Securities Act
### (Against All Defendants)

94.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

95.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

96.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

97.     DiDi is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

98.     As issuer of the shares, DiDi is strictly liable to Plaintiff and to the members of the Class who purchased pursuant and/or traceable to the Registration Statement for the IPO which contained the materially untrue statements and omissions alleged herein.

99.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement was true and without omissions of any material facts and were not misleading.

100.    The Individual Defendants were officers and/or directors of DiDi and signed the Registration Statement or authorized it to be signed on their behalf and were responsible for the contents and dissemination of the Registration Statement.

101.    By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

102.    Plaintiff acquired DiDi shares pursuant and/or traceable to the Registration Statement for the IPO.

103.    Plaintiff and the Class have sustained damages.  The value of DiDi shares has declined substantially subsequent to and due to the Defendants' violations.

### SECOND CLAIM
**Violation of Section 15 of the Securities Act**
**(Against the Individual Defendants)**

104.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness or intentional misconduct.

105.    This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

106.    The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of DiDi within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power and influence and exercised the same to cause DiDi to engage in the acts described herein.

107.    The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

108.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**THIRD CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against DiDi and the Exchange Act Individual Defendants**

109.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

110.    During the Class Period, DiDi and the Exchange Act Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase DiDi's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, DiDi and the Exchange Act Individual Defendants, and each defendant, took the actions set forth herein.

111.    DiDi and the Exchange Act Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for DiDi's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. DiDi and the Exchange Act Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

112.    DiDi and the Exchange Act Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about DiDi's financial well-being and prospects, as specified herein.

113.    DiDi and the Exchange Act Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged

in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DiDi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DiDi and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

114.    Each of the DiDi and the Exchange Act Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Exchange Act Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

115.    DiDi and the Exchange Act Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such

facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DiDi's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by DiDi and the Exchange Act Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial wellbeing, and prospects throughout the Class Period, DiDi and the Exchange Act Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

116.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of DiDi's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by DiDi and the Exchange Act Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by DiDi and the Exchange Act Individual Defendants, but not disclosed in public statements by DiDi and the Exchange Act Individual Defendants during the Class Period, Plaintiff and the other members of the Class acquired DiDi's securities during the Class Period at artificially high prices and were damaged thereby.

117.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DiDi was experiencing, which were not disclosed by Defendants, Plaintiff and other members

of the Class would not have purchased or otherwise acquired their DiDi securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

118.    By virtue of the foregoing, DiDi and the Exchange Act Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

119.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**FOURTH CLAIM**
**Violation of Section 20(a) of The Exchange Act**
**Against the Exchange Act Individual Defendants**

120.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

121.    The Exchange Act Individual Defendants acted as controlling persons of DiDi within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. The Exchange Act Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

122.     In particular, the Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

123.     As set forth above, DiDi and the Exchange Act Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XI.   JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: July 12, 2021                KAPLAN FOX & KILSHEIMER LLP

By: /s/ *Jeffrey P. Campisi*

Jeffrey P. Campisi
Robert N. Kaplan
Frederic S. Fox
Pamela A. Mayer
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone:  212-687-1980
Facsimile:  212-687-7714
Email: jcampisi@kaplanfox.com
Email: rkaplan@kaplanfox.com
Email: ffox@kaplanfox.com
Email: pmayer@kaplanfox.com

*Counsel for Plaintiff Jatin Chopra and the Proposed Class*